24-28
*United States v. Parks*

# United States Court of Appeals
# For the Second Circuit

---

August Term 2025
Argued: April 14, 2026
Decided: June 22, 2026

No. 24-28

---

UNITED STATES OF AMERICA,

*Appellee*,

*v.*

EDWARD MICHAEL PARKS, AKA LEE, AKA TROUBLE,

*Defendant-Appellant*.

---

Appeal from the United States District Court
for the District of Connecticut
No. 03:19-cr-00299
Kari A. Dooley, *Judge*.

---

Before:     JACOBS, WESLEY, and PARK, *Circuit Judge*s.

Defendant-Appellant Edward Parks appeals from a judgment entered in the United States District Court for the District of Connecticut (Dooly, *J.*), convicting him, following a jury trial, of two counts of kidnapping resulting in death in violation of Title 18 United States Code § 1201(a)(1) and one count of witness tampering by killing in violation of Title 18 United States Code §§ 1512(a)(1)(C) & 1512(a)(3)(A) and imposing three consecutive life sentences. Parks argues that the district court erred by instructing the jury that Parks' acts needed only be the but-for cause of the victims' deaths, and not that the deaths needed to be foreseeable from the kidnapping (in other words, that the kidnapping needed to be the proximate cause). Parks also raises a number of challenges to the sufficiency of the evidence to convict on all counts. **AFFIRMED**.

―――――

> BRIAN A. JACOBS (Sloane Lewis *on the brief*), Morvillo Abramowitz Grand Iason & Anello PC, New York, NY, *for Defendant-Appellant*.
>
> ELENA LALLI CORONADO (Reed Durham *on the brief*), Assistant United States Attorneys, *for* David X. Sullivan, United States Attorney for the District of Connecticut, New Haven, CT, *for the United States of America*.

―――――

DENNIS JACOBS, *Circuit Judge*:

A jury convicted Defendant-Appellant Edward Parks on two counts of kidnapping resulting in death in violation of Title 18 United

States Code § 1201(a)(1) and one count of witness tampering by killing in violation of Title 18 United States Code §§ 1512(a)(1)(C) & 1512(a)(3)(A).  Parks argues that the United States District Court for the District of Connecticut (Dooly, *J.*) improperly instructed the jury on the elements of kidnapping resulting in death and challenges the sufficiency of the evidence on all three counts.  Parks is serving three consecutive life sentences.

We **AFFIRM**.  The district court properly instructed the jury that, pursuant to Section 1201(a)(1), the kidnapping needed only be the "but-for" cause of the victims' deaths, not necessarily the proximate cause.  Evidence at trial overwhelmingly established that Parks was the one to kidnap his first two victims, that the kidnapping was the but-for cause of their deaths, and that he murdered the third in anticipation that the third would talk to federal law enforcement.

# I

A.    <u>Trial Evidence</u>

Parks was convicted in 2023 on two counts of kidnapping resulting in the deaths of Damian Connor[1] and Tamar Lawrence, and on one count of witness tampering by killing eyewitness Devante Williams.  The government presented the following facts at trial.

In 2015, Parks was a gang member who was trafficking firearms out of his girlfriend's house.  Present at the house with Parks on the day of the murders were his girlfriend (who testified) and various family and friends—including witnesses Jose Covington and Rayquan Carr (who both testified) and Williams (who was murdered).  Also present that day, shopping for guns, were Eric Gomez (who testified) and Connor and Lawrence (who were kidnapped and murdered).

---

[1] Although the trial record and various filings spell the name, at times, with an "er," the Indictment spells "Connor" with an "or."

When Gomez left with two of Parks' guns without paying, Parks directed people in the house to call Gomez demanding return of the guns or payment. As collateral, Parks held Connor and Lawrence, with guns in his sweatshirt pocket, and told them that they were not allowed to leave unless Parks received his guns or money for them. Gomez was threatened over the phone that if the guns were not returned by 7 p.m., Parks would hurt Connor and Lawrence.

When Gomez failed to return by the 7 p.m. deadline, Parks advised Connor and Lawrence, "time's up." Connor protested that he could get the money; Parks told Connor to retrieve it and directed Carr, Lawrence, Williams, and Covington to join them both on a ride. Connor drove Parks, Carr, and Lawrence in his car, with Parks in the front passenger seat still armed. Covington drove himself and Williams in another car. At a residential address, Lawrence remained in the car with Carr and an armed Parks while Connor went to retrieve cash. After Connor returned, he drove to a different parking

lot, where Parks had directed Covington and Williams to meet up with the group in Connor's car. In the parking lot, Connor gave Parks his money, saying "this is all I have, bro."

Carr testified that once Connor handed over the money and Carr began exiting Connor's car, Parks shot Connor and Lawrence, and that Carr immediately ran out of Connor's car and into Covington's car. Covington—who witnessed the murders from inside the other car—testified that he heard gunshots, saw a muzzle flash in Connor's car, and saw Carr run out of Connor's car. Covington testified that after Carr left Connor's car, Parks exited Connor's car, wiped down parts of it with his sleeve, and then joined them in Covington's car.[2] Carr testified that Parks pulled his sleeve

---

[2] Ballistics evidence from the autopsies and inside the car corroborated Carr's account of the revolver Parks used to shoot Connor and Lawrence. DNA evidence inside the car also corroborated witness accounts that Carr was sitting in the backseat and Parks was sitting in the front passenger seat, and that the shots that killed Connor and Lawrence came from the front seat.

over his hand before exiting Connor's car and shutting the door.

After Parks, Carr, Covington, and Williams had regrouped in the second car, they drove away.  On the drive, Williams asked Parks, "What are you doing, like, what's going on?"

Carr testified that, later that day, he saw Parks murder Williams.[3]  Afterward, Parks told Covington that "[h]e had to get rid of my boy, too . . . [b]ecause he-he talked too much."  App'x 530; *see also* App'x 610 (Covington: "Yeah. He said he talks too much.").

In closing arguments, Parks argued that Carr shot all three victims.  Parks highlighted evidence that Carr, who was in prison after the events, told other inmates that he shot Williams and that Carr rapped and posted on Facebook about killing people around the time of the murders.

---

[3] An eyewitness who lived nearby also observed a man of Parks' description shoot the victim; her bystander account at trial generally corroborated Carr's account.

7

B.     Jury Instructions

At the conclusion of trial, the district court charged the jury on Counts One and Two and the elements of kidnapping resulting in death:

> First, that Mr. Parks seized, confined, inveigled, kidnapped, abducted or carried away [Damian Connor/Tamar Lawrence].  Second, Mr. Parks held [Connor/Lawrence] for ransom.  Third, Mr. Parks used any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense.  Fourth, Mr. Parks acted unlawfully, knowingly, and willfully.  And fifth, Mr. Parks' acts resulted in the death of [Connor/Lawrence].

App'x 1359-1360.  Prior to the charge, the government requested that the court instruct the jury that it need find only but-for causation to satisfy the "resulted in death" element; Parks advocated for an instruction that the "resulted in death" element contains a proximate causation requirement—that it was "reasonably foreseeable" that Parks' conduct would lead to the deaths of the victims "during the course of the kidnapping."  The request to charge on proximate cause was denied on the basis of this Court's decision concerning a

8

similarly-worded death-results enhancement in the carjacking statute in *United States v. Felder*, 993 F.3d 57 (2d Cir. 2021). During the conference, the district court asked the government whether it intended to "to take the position at closing arguments that it does not have to prove that Mr. Parks pulled the trigger with respect to Damian Conner and Tamar Lawrence." App'x 1307. On the government's assurance that it intended to argue no such theory, the court gave the following charge explaining the fifth element of Counts One and Two:

> The fifth element that the Government must prove beyond a reasonable doubt is that the Defendant's acts resulted in the death of [Connor/Lawrence]. To prove this element, the Government must prove that [Connor/Lawrence] is deceased and that his death resulted from the willful and intentional conduct of the Defendant.
>
> To establish that the Defendant's conduct *resulted in the death of [Connor/Lawrence]*, the Government must prove beyond a reasonable doubt that *but for the Defendant's actions [Connor/Lawrence] would not have died*. Here, the Government asserts that the Defendant shot and killed [Connor/Lawrence].

9

App'x 1362-63 (emphasis added).

During summations, the government duly argued that Parks was the one to shoot Connor and Lawrence. As to Count Three, the government argued that Parks murdered Williams to prevent him from reporting the murders to federal law enforcement.

After deliberations began, the jury asked for clarification: "Per page 11 paragraph 5, to prove this element, is it necessary that the Government's assertion in the last sentence of the second section [that Parks was the shooter] be the only way to satisfy the requirement of the Defendant's actions resulting in the deaths in Counts One and Two?" App'x 1465-66. After consulting the parties, and over Parks' objection, the district court gave a supplemental instruction:

> Ladies and gentlemen, you have asked with respect to the fifth element of Counts One and Two whether the Government's assertion as stated in the jury instructions is the only way to satisfy the requirement of the Defendant's actions resulting in the death of Mr. Connor and Mr. Lawrence.
>
> The short answer to this inquiry is No. Let me

10

repeat and supplement this charge. The Government must prove that the victim is deceased and that his *death resulted* from the willful and intentional conduct of the Defendant. To establish that the Defendant's conduct *resulted in the death of the victim*, the Government must prove beyond a reasonable doubt that *but for the Defendant's actions, the victim would not have died*. The Defendant's action is conduct on the part of the Defendant that he voluntarily undertakes. However, because neither the Government nor the Defendant have submitted argument to you as to this issue, *I am going to give the parties the opportunity to present additional arguments, in light of your inquiry*.

App'x 1503-1504 (emphasis added). In Parks' supplemental closing, he re-emphasized the lack of evidence that the kidnapping caused the deaths of Connor and Lawrence but acknowledged that "the law is that you don't need to find that the Defendant is actually the one that pulled the trigger in order to find him guilty." After several more hours of deliberation, the jury returned a verdict of guilty on all counts. Following the verdict, Parks moved for an acquittal or, alternatively, for a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. The district court denied the motion, and this

appeal followed.

## II

Parks challenges the jury instructions for Counts 1 and 2, and the sufficiency of evidence for all three counts.

A.     Counts 1 and 2 – Kidnapping Resulting in Death

*1.     Governing Law*

Parks challenges the denial of his Rule 29 motion, arguing insufficiency of evidence.  "[A]fter viewing the evidence in the light most favorable to the prosecution," we must affirm if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (emphasis and quotation marks omitted).  A "jury is entitled to base its decision on reasonable inferences from circumstantial evidence," and ultimately, "the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court." *United States v. Ho*, 984 F.3d 191, 199 (2d Cir. 2020)

(cleaned up).  In the alternative to acquittal, Parks argued for a new trial pursuant to Rule 33.  Fed. R. Crim. P. 33(a).  Although courts have "broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to [Rule] 29, where the truth of the prosecution's evidence must be assumed, that discretion should be exercised sparingly and only in the most extraordinary circumstances." *United States v. Landesman*, 17 F.4th 298 (2d Cir. 2021) (cleaned up).  A court considering a Rule 33 motion "must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)).

Parks also challenges the jury instructions.  "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or

13

does not adequately inform the jury on the law." *United States v. Zheng*, 113 F.4th 280, 298 (2d Cir. 2024) (cleaned up). "In reviewing a jury instruction, we examine not only the specific language that the defendant challenges but also the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Guldi*, 141 F.4th 435, 446 (2d Cir. 2025) (quoting *United States v. Raniere*, 55 F.4th 354, 362 (2d Cir. 2022)).

Even when error is found, we may nevertheless affirm if the error is harmless. *Id.*; Fed. R. Crim. P. 52(a). Where the error in a jury instruction is an omitted element, this Court "consider[s] the weight of trial evidence bearing on the omitted element; and if such evidence is overwhelming and essentially uncontroverted, there is no basis for concluding that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Gomez*, 580 F.3d 94, 100-01 (2d Cir. 2009) (citation omitted). The government bears the burden of establishing "beyond a reasonable doubt that a

14

rational jury would have found the defendant guilty absent the error." *United States v. Silver*, 948 F.3d 538, 547 (2d Cir. 2020) (citation omitted).

> 2. *Proximate Cause*

The crux of Parks' appeal is whether the district court should have instructed the jury that death needed to be a reasonably foreseeable result of the kidnapping—in other words, that the kidnapping was the proximate as well as the but-for cause of death. We review this preserved challenge *de novo*. *Guldi*, 141 F.4th at 446; *United States v. Capers*, 20 F.4th 105, 116 (2d Cir. 2021).

Section 1201(a)(1) sets out enhanced penalties for kidnapping (death or life imprisonment) "if the death of any person results." 18 U.S.C. § 1201(a)(1). Kidnapping has three elements: "the victim must be unlawfully taken, coerced, or deceived into accompanying the accused nonconsensually; he or she must be held by the accused for ransom, reward or otherwise; and he or she must be transported in

interstate or foreign commerce." *United States v. Corbett*, 750 F.3d 245, 250 (2d Cir. 2014) (quoting *United States v. Macklin*, 671 F.2d 60, 65 (2d Cir. 1982)). A "death results" enhancement like this one, which "increased the minimum and maximum sentences to which [a defendant] was exposed, . . . is an element that must be submitted to the jury and found beyond a reasonable doubt." *Burrage v. United States*, 571 U.S. 204, 210 (2014). The supplemental charge instructed that "[t]o establish that the Defendant's conduct resulted in the death of the victim, the Government must prove beyond a reasonable doubt that but for the Defendant's actions the victim would not have died." App'x at 1503-04. The issue on appeal is whether the "death results" enhancement required the government also to prove proximate cause.

The plain language of Section 1201(a) does not include a proximate cause requirement, and we have held that "[g]enerally" in statutes with a "death results" enhancement, the phrase "'results

16

from' imposes a requirement of actual or but-for causation … and not proximate causation." *Felder*, 993 F.3d at 69 (cleaned up). The *Felder* defendants argued that the "death results" enhancement in the carjacking statute—similarly worded[4] to the kidnapping statute— required a finding of proximate cause. *Id.* at 69-70. Adopting principles applied by other circuits interpreting similar "death results" language in the Controlled Substances Act, *Felder* concluded that proximate cause is not required under the carjacking statute, for three reasons. First, "Congress' use of the phrase 'results from' rather than 'causes,'" is telling because "resulting in death and causing death are not equivalents." *Id.* at 69 (quoting *United States v.*

---

[4] 18 U.S.C. § 2119(3) states, in relevant part:

> Whoever, with the intent to cause death or serious bodily harm takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall— . . .

> (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

17

*Burkholder*, 816 F.3d 607, 614 (10th Cir. 2016). Second, "Congress' use of the passive voice in the phrase 'results from,'…generally 'evinces a concern with whether something happened—not how or why it happened.'" *Id.* at 69-70 (quoting *Burkholder*, 816 F.3d at 614). Last, "where a defendant is proved to have acted" with injurious intent in commission of a violent carjacking, a requirement that the resulting death "be 'foreseeable' appears redundant and even confusing." *Id.* at 70.

The *Felder* analysis applies here. Section 1201(a) uses the word "results"; and Congress knows how to include an explicit proximate cause requirement in a punishment enhancement, as it has done in myriad other statutes.[5] Further, kidnapping, like carjacking, is

_____

[5] *See, e.g.,* 18 U.S.C. § 247(d)(2) & (3) (enhanced punishment for damaging religious property where "bodily injury results . . . as a direct or proximate result of conduct prohibited by this section"), *id.* § 844(d) (enhanced punishment for transportation of explosives, where "personal injury results . . . as a direct or proximate result of conduct prohibited by this subsection"), *id.* § 844(f)(2) & 3 (enhanced punishment for transportation of explosives "and as a result of such

18

generally considered a violent crime. *See* 18 U.S.C. § 1959 (prohibiting "violent crimes in aid of racketeering," including kidnapping); *United States v. Rosa*, 11 F.3d 315, 324 (2d Cir. 1993) (listing kidnapping among the "violent crimes" committed by defendant); *United States v. Lee*, 818 F.2d 1052, 1054 (2d Cir. 1987) (same); *cf. United States v. Telesco*, 962 F.2d 165 (2d Cir. 1992) ("[F]or purposes of determining career offender status under the Guidelines, there is no such thing as a non-violent kidnapping…"). Requiring that death be "foreseeable" as a result of kidnapping may be "redundant and even confusing." *See Felder*, 993 F.3d at 70. Parks maintains that kidnapping is not inherently dangerous because it can

---

conduct, directly or proximately causes" personal injury or death), *id.* § 844(i) (enhanced punishment for damaging or destroying by fire or explosives, any building, vehicle, or real or personal property "if personal injury results to any person . . . as a direct or proximate result of conduct prohibited by this subsection") *see also id.* § 38(b)(2) & (3) (enhanced penalty for fraud related to aircraft parts where "the part . . . is the proximate cause of a malfunction or failure that results in" serious bodily injury or death).

involve either "physical *or* psychological force." Appellant Reply at 14 (quoting *Corbett*, 750 F.3d at 251). Still, holding someone against their will, no matter if the threatened force is physical or psychological,[6] often creates dangers that may lead to death.

Parks' main argument is that our decision in *United States v. Guillette* requires that Section 1201(a)'s "death results" enhancement be read to require no less than proximate cause. 547 F.2d 743 (2d Cir. 1976). But *Guillette*'s holding does not compel the conclusion that every criminal statute with a "death results" clause requires a foreseeability finding. The *Guillette* defendants were convicted of killing a suspected informant by exploding a bomb in his home. The two defendants were convicted of (1) obstruction of justice through use of force, in violation of 18 U.S.C. § 1503, and (2) conspiracy against

---

[6] *Macklin*, 671 F.2d at 64 ("The very nature of the crime of kidnapping requires that the kidnapper use some means of force-actual or threatened, physical or mental-in each elemental stage of the crime, so that the victim is taken, held and transported against his or her will.").

civil rights, pursuant to 18 U.S.C. § 241, which punishes conspiracy to "injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution . . . ," and provides for a sentence enhancement "if death results" from the conspiracy.[7] 18 U.S.C. § 241. The defendants argued that the victim himself installed the bomb as a booby trap, and that the trial court erred in refusing their proposed instruction requiring the jury to find "beyond a reasonable doubt that death was deliberate." *Id.* This Court rejected defendants' argument that the "death results" statutory phrase requires proof of "direct causation" and held instead that defendants could be liable if their acts proximately caused the victim's death. *Id.* at 748-49.

*Guillette* does not aid Parks' case. Like the defendants in

---

[7] The right to be a witness in a federal trial is a civil right secured by the Constitution and is therefore protected by Section 241. *Id.* at 748 (citing *United States v. Pacelli*, 491 F.2d 1108, 1113-15 (2d Cir. 1974), *cert. denied*, 419 U.S. 826 (1974).

21

*Guillette*, Parks could be held liable for deaths resulting from kidnapping even if the jury believed his defense that the victims were murdered by Carr—a third party. Moreover, *Guillette* derived its holding from the "fundamental principle of criminal law [] that a person is held responsible for all consequences proximately caused by his criminal conduct," even if "his acts were not the immediate cause of the victim's death or injury." *Id.* at 749. In that sense, embedding proximate cause in the "death results" phrase in Section 241 states what is sufficient in every such instance, rather than what is required in all cases. *Guillette*'s acknowledgment of the general principle that consequences should flow from the scope of the crime does not inject a foreseeability element into every crime with a "death results" enhancement.

Further, *Guillette* preceded modern Supreme Court cases that have expanded and clarified the bounds of causation in the context of intentional crimes. First, *Burrage v. United States* held that "death

22

results" language in an similarly-worded statute imposes a but-for causation requirement. 571 U.S. 204, 210 (2014). [8] Although it is the rule that "a defendant generally may not be convicted unless his conduct is 'both (1) the actual cause, and (2) the legal cause (often called proximate cause) of the result,'" *id.* at 210, "we read into the statute 'only that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct.'" *Elonis v. United States*, 575 U.S. 723, 736 (2015). The underlying kidnapping offense requires that, irrespective of whether death results, the alleged kidnapper acted with "a willful intent. . . to confine the victim." *United States v. Krivoi*, 80 F.4th 142, 150 (2d Cir. 2023) (cleaned up). A "willful intent" to confine, *id.* (cleaned up), ensures that kidnapping "falls outside the realm of otherwise innocent conduct," and therefore "fully satisfie[s]" "the concerns underlying the presumption in favor of scienter."

---

[8] The Court did not reach the question of whether a proximate cause finding is required under the "death results" enhancement. *Id.*

*Elonis*, 575 U.S. at 737 (quoting *Carter v. United States*, 530 U.S. 255, 269–70 (2000)).

Any error here would nevertheless be harmless because the trial evidence established beyond reasonable doubt that Parks' kidnapping of Connor and Lawrence was the proximate cause of their deaths. Considering the "trial evidence bearing on the [purportedly] omitted element," *Gomez*, 580 F.3d at 100–01 (cleaned up), multiple witnesses testified that Parks held the victims at gunpoint and prevented them from leaving. Since death is certainly foreseeable from holding someone at gunpoint, the evidence established beyond reasonable doubt that Parks' kidnapping of Connor and Lawrence was the proximate cause of their deaths. *Silver*, 948 F.3d at 547.

3.      *Other sufficiency arguments*

Parks' remaining challenges to the sufficiency of the evidence on the two counts of kidnapping resulting in death are reviewed *de novo*. *Capers*, 20 F.4th at 113. Parks argues first that the deaths of

24

Connor and Lawrence could not *result* from the kidnapping because the kidnapping ended once Connor handed over the money. But the evidence at trial was sufficient to establish that the victims were still in the car with their armed kidnapper when Parks pulled the trigger. No reasonable victim still held at gunpoint would have believed they were free to leave. Second, Parks argues that the kidnapping was not the but-for cause of the victims' deaths because the theory he presented to the jury was that Connor and Lawrence were shot by Carr, not Parks. But even if the jury believed that Carr was the gunman, the evidence was still sufficient for it to find that Parks' commission of the kidnapping—which set in motion all the day's events—was the but-for cause of the deaths.

4.    *Supplemental Jury Instructions*

Parks argues that the supplemental jury instructions erroneously stated that death must result from "actions" of the defendant, as opposed to specifically from the kidnapping. He

25

contends that the instruction left room for the jury to consider Parks'
acts other than the kidnapping, such as his illegal gun sales. Parks
failed to raise this argument during trial or deliberations, so we
review for plain error. *Guldi,* 141 F.4th at 446. "To demonstrate plain
error, a defendant must show (1) error, (2) that was clear and obvious
under existing law, *i.e.*, law established at the time of this appeal, (3)
that affected his substantial rights, and (4) that cast doubt on the
fairness, integrity, or public reputation of judicial proceedings." *Id.*
(internal quotation marks omitted).

On any standard of review, this argument ignores the vital
"context of the instructions as a whole," which were singularly
focused on the act of kidnapping. *United States v. Denkberg*, 139 F.4th
147, 160 (2d Cir. 2025) (cleaned up). Parks objects to the framing of
the fifth element in the supplemental instruction. But in that respect,
the supplemental instruction was nearly verbatim the instruction
given during the initial charge, in which the fifth element (and its

reference to "Defendant's actions") was preceded by explanations of the first four elements, which either mentioned kidnapping explicitly or via description of a forced taking.[9] The district court's recitation of the fifth element in the supplemental instruction is properly placed in the same context, as the jury was tasked with finding each element beyond a reasonable doubt. *See id.* (concluding that "the context of the instructions" is important "[f]or supplementary instructions in

---

[9] *See* App'x 1360 ("The first element that the Government must prove beyond a reasonable doubt is that the Defendant seized confined, inveigled, kidnapped, abducted or carried away the victim -- Damian Conner. 'Kidnap' means to take and carry away a person by force and against his will."); *id.* 1361 ("The second element that the Government must prove beyond a reasonable doubt is that the Defendant held Damian Conner for ransom."); *id.* 1361-1362 ("The third element … is that the Defendant used any means, facility or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense. . . . If you find that a cellular telephone was used in some way in committing or in furtherance of the charged kidnapping, the Government has satisfied this element."); *id.* 1362 ("The fourth element … is that the Defendant acted unlawfully, knowingly and willfully. . . . In order to satisfy this element, the Government must show that the Defendant knew that Damian Conner was not accompanying him voluntarily, but rather, was forced or coerced or tricked into coming along with him.").

particular" (cleaned up)).

Parks also argues that it was a violation of his due process rights to instruct the jury, upon its question, that the government need not prove that Parks was the shooter to find him guilty of kidnapping resulting in death because it "permit[ted] the prosecution to change its theory of the case at the last moment." Appellant Br. at 2. But Parks was aware as far back as the charging conference that the district court interpreted the law to be that he could be found guilty of causing the victim's death without necessarily having been the shooter. And the district court complied with the precedent Parks cites for his due process argument; Parks was given an opportunity "to be heard on the specific charges of which he is accused" throughout trial and again during supplemental closing arguments. *Dunn v. United States*, 442 U.S. 100, 106 (1979).[10]

---

[10] Parks suffered no violation of his rights from the jury instructions as to Counts One and Two, which defeats Parks' argument as to spillover effects on Count Three. *See United States v. Aiello*, 118 F.4th

B.      Count 3 – Witness Tampering by Killing

Parks challenges the sufficiency of the evidence to show that the killing of Williams constituted witness tampering on the ground that the evidence failed to establish a reasonable likelihood that Williams would have communicated with federal officers.  We review the sufficiency of the evidence as to Count 3 *de novo*.  *Capers*, 20 F.4th at 113.

Section 1512 makes it a federal crime to "kill or attempt[] to kill another person, with intent to . . . prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense." 18 U.S.C. § 1512(a)(1)(C).  To prove that a killing was intended to prevent communication with a federal law enforcement officer, "the Government must show that there was a *reasonable*

---

291, 305 (2d Cir. 2024), *cert. denied sub nom. Ciminelli v. United States*, 145 S. Ct. 2814 (2025).

*likelihood* that a relevant communication would have been made to a federal officer." *Fowler v. United States,* 563 U.S. 668, 670 (2011). The likelihood of communication with a federal officer must be "more than remote, outlandish, or simply hypothetical" but need not be shown to be "beyond a reasonable doubt, nor even that it is more likely than not." *Id.* at 678.

An FBI Special Agent testified that she "would have liked to talk to" Williams about Connor's and Lawrence's deaths. App'x 1267. Parks emphasizes the conditional phrasing, but that testimony was hardly necessary considering that every witness to the murders still alive testified for the government. The prospect that federal agents would have contacted Williams concerning Parks' crimes was by no means "remote, outlandish, or simply hypothetical," *Fowler*, 563 U.S. at 678, especially considering that the FBI was involved in investigating the murders since the day they happened and the murders arose from illicit firearm sales. Finally, Parks posits that

Williams "may not have been willing to talk" to law enforcement, Appellant Br. 51; but a rational jury could conclude otherwise based on the testimony that Parks told Covington that he "had to get rid of my boy [Williams], too . . . [b]ecause he . . . talked too much." App'x 530.

## III

We have considered the remainder of Parks' arguments and find them to lack merit. For these reasons, we AFFIRM Parks' convictions.

31